**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

KRISTEN GEARHART,

Plaintiff,

Case No.

vs.

UNIVERSITY OF COLORADO COLORADO SPRINGS,
THE REGENTS OF THE UNIVERSITY OF COLORADO, a body corporate,
MARK TOMFORDE, ZACHARY MESYAN, GENE ABRAMS,
REX WELSHON, LYNN VIDLER, TOM CHRISTENSEN, KELLI KLEBE,
VENKAT REDDY, LAURA EMMOT, MARK KENNEDY, and
JOHN/JANE DOES 1 through 4,

Defendants.

# COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS AND TITLE IX

Plaintiff Kristen Gearhart, by and through her attorney, Paul Linnenburger of Lane + Linnenburger + Lane LLP, brings the following causes of action:

## INTRODUCTION

College is a time of immense promise in a young life. It is also a time of tremendous vulnerability and extreme power disparity between the educators at the institution and the burgeoning professional, a disparity that becomes more pronounced as one advances further within academia into graduate and doctoral studies. This case is one of abuse of that power by one educator, Mark Tomforde, and the aid and comfort he received from others within the institution while yet another aspiring female mathematician was manipulated, groomed, and sexually assaulted by Tomforde, an educator with tremendous influence and, it turns out, protectors in important positions.

The University of Colorado Colorado Springs advertises on its website that it offers “hands-on learning experiences” in “an environment free from sexual misconduct, discrimination

or harassment." The Math Department appears to believe itself exempt from these creed. Mark Tomforde came to the UCCS Math Department from the University of Houston, where his history of boundary crossing and harassment of female students resulted in a significant curtailment of his role and responsibilities. Undeterred, he found a protective home within the UCCS Math Department, where not a single female operates as a professor, and took full advantage of the Good Ol' Boy Club atmosphere to select, groom, harass, demean, and ultimately physically and sexually assault the Plaintiff.

Plaintiff wanted nothing more than to advance in life and her chosen field, and Tomforde took full advantage of her situation. He manipulated, groomed, threatened, and abused Plaintiff through his position and used it to force subservience to his perverted whims. The "hands-on learning experience" that Tomforde gave Plaintiff had less to do with mathematics, and more to do with Tomforde groping and grabbing her, including pinning her down and fondling her under her clothing.

Plaintiff spent her now cut-short post-graduate career living in fear of his outbursts and threats, mired in self-blame and unable to process his abusive conduct and its consequences. Only recently has she begun to confront the same, and in the process, has uncovered a system within the UCCS mathematics department that continues to sweep sexual misconduct and harassment under the rug, a department more concerned with protecting the Good Ol' Boy than providing a safe environment for its students – culture of silence that serves only to protect male predators. This suit is Plaintiff's effort to obtain justice for herself and to ensure UCCS finally lives up to its creed and provides future students the safe environment falsely promised to her.

PARTIES

1. Plaintiff is a resident of El Paso County, State of Colorado.

2. Defendant University of Colorado Colorado Springs (hereinafter "UCCS") is a State of Colorado educational institution and entity of the State of Colorado operating as a public university engaged in the business of post-secondary education with its primary campuses in Boulder, Denver and Colorado Springs. C.S.A. § 23-20-101. Said Defendant obtains and receives funding and financial assistance from the United States Government and did so at all times material hereto. UCCS is governed and operated by a board of regents, a body corporate created by the Constitution of the State of Colorado known as the Regents of the University of Colorado. Co. Const. Art. IX, § 12.

3. Defendant Regents of the University of Colorado (hereinafter "Regents") is the governing body corporate over Defendant UCCS with general supervisory authority and control and direction thereof, including control and direction of all funds and appropriations to the University of Colorado Colorado Springs to include all funding and financial assistance from the United States Government. The Regents For purposes of this suit, the two are addressed as the same and collectively referred to as "UCCS".

4. Defendant Mark Tomforde is a resident of El Paso County, State of Colorado, and, at all times relevant hereto, was an employee and agent of UCCS and public actor in relation thereto. Defendant Tomforde is sued in his personal and official capacity and his actions material hereto were in the course and scope of his duties as an employee and agent of UCCS and under color of law.

5. Defendant Zachary Mesyan is, upon information and belief, a resident of El Paso County, State of Colorado and is and was, at all times relevant hereto, an employee and agent of UCCS and public actor in relation thereto. During relevant and material times, Defendant Mesyan was an employee of UCCS with managerial and supervisory responsibility over Defendant

Tomforde as Chair of the Department of Mathematics within the College of Letters, Arts and Sciences at the University of Colorado Colorado Springs. Defendant Mesyan is sued in his personal and official capacity and his actions material hereto were in the course and scope of his duties as an employee and agent of UCCS and under color of law.

6. Defendant Gene Abrams is, upon information and belief, a resident of El Paso County, State of Colorado and is and was, at all times relevant hereto, an employee and agent of UCCS and public actor in relation thereto. Defendant Abrams is sued in his personal and official capacity and his actions material hereto were in the course and scope of his duties as an employee and agent of UCCS and under color of law.

7. Defendant Rex Welshon is, upon information and belief, a resident of El Paso County, State of Colorado and is and was, at all times relevant hereto an employee and agent of UCCS and public actor in relation thereto. During relevant and material times, Defendant Welshon was an employee of UCCS with managerial and supervisory responsibility over Defendant Tomforde as Dean of the College of Letters, Arts and Sciences at the University of Colorado Colorado Springs, which includes the Department of Mathematics where Tomforde is employed. Defendant Welshon is sued in his personal and official capacity and his actions material hereto were in the course and scope of his duties as an employee and agent of UCCS and under color of law.

8. Defendant Lynn Vidler is, upon information and belief, a resident of El Paso County, State of Colorado and is and was, at all times relevant hereto an employee and agent of UCCS and public actor in relation thereto. During relevant and material times, Defendant Vidler was an employee of UCCS with managerial and supervisory responsibility over Defendant Tomforde as Dean of the College of Letters, Arts and Sciences at the University of Colorado

Colorado Springs, which includes the Department of Mathematics where Tomforde is employed. Defendant Vidler is sued in her personal and official capacity and her actions material hereto were in the course and scope of her duties as an employee and agent of UCCS and under color of law.

9. Defendant Tom Christensen is, upon information and belief, a resident of El Paso County, State of Colorado and is and was, at times relevant hereto an employee and agent of UCCS and public actor in relation thereto. During relevant and material times, Defendant Christensen was an employee of UCCS with managerial and supervisory responsibility over Defendant Tomforde as Provost of the University of Colorado Colorado Springs. Defendant Christensen is sued in his personal and official capacity and his actions material hereto were in the course and scope of his duties as an employee and agent of UCCS and under color of law.

10. Defendant Kelli Klebe is, upon information and belief, a resident of El Paso County, State of Colorado and is and was, at times relevant hereto an employee and agent of UCCS and public actor in relation thereto. During relevant and material times, Defendant Klebe was an employee of UCCS with managerial and supervisory responsibility over Defendant Tomforde as Provost of the University of Colorado Colorado Springs. Defendant Klebe is sued in her personal and official capacity and her actions material hereto were in the course and scope of her duties as an employee and agent of UCCS and under color of law.

11. Defendant Venkat Reddy is, upon information and belief, a resident of El Paso County, State of Colorado and is and was, at times relevant hereto an employee and agent of UCCS and public actor in relation thereto. During relevant and material times, Defendant Reddy was an employee of UCCS with managerial and supervisory responsibility over Defendant Tomforde as Chancellor of the University of Colorado Colorado Springs. Defendant Reddy is sued in his

personal and official capacity and his actions material hereto were in the course and scope of his duties as an employee and agent of UCCS and under color of law.

12. Defendant Laura Emmot is, upon information and belief, a resident of El Paso County, State of Colorado and is and was, at times relevant hereto, an employee and agent of UCCS with managerial and supervisory responsibility over Defendant Tomforde as Director of Institutional Equity. Defendant Emmot is sued in her personal and official capacity and her actions material hereto were in the course and scope of her duties as an employee and agent of UCCS and under color of law.

13. Defendant Mark Kennedy is, upon information and belief, a resident of the District of Columbia and was, at times relevant hereto, the President of the University of Colorado with oversight and managerial responsibilities over the UCCS campus and faculty thereof, including Defendant Tomforde. Defendant Kennedy is sued in his personal and official capacity and his actions material hereto were in the course and scope of his duties as an employee and agent of the Regents and under color of law.

14. Defendants John/Jane Does 1 through 4 were employees and agents of UCCS with managerial responsibility and appointment authority over Defendant Tomforde as administrative leadership persons of UCCS during the relevant time period discussed below and/or with authority to oversee and enforce anti-discrimination and anti-harassment laws, policies and procedures within the UCCS system through Office of Institutional Equity positions. Defendants Does 1 through 4 are sued in their personal and official capacity and their actions material hereto were in the course and scope of their duties as employees and agents of UCCS and under color of law.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over the subject matter and parties to this action pursuant to the Court's general jurisdiction, 28 U.S.C. § 1331, 42 U.S.C. § 1983, and 42 U.S.C. § 1985.

16. Venue is proper pursuant to 28 U.S.C. § 1391 as a substantial part of the events giving rise to the claim occurred in Colorado and all defendants are residents of this district. events giving rise to the claims presented herein occurred in Dona Ana County and Plaintiff is a resident thereof.

## FACTUAL ALLEGATIONS

17. The preceding paragraphs are incorporated as if fully stated herein.

18. The Regents of the University of Colorado ("Regents") have general supervision of the University of Colorado, including all sub-parts thereof such as the University of Colorado Colorado Springs. This general supervision includes responsibility for oversight and management of the operations of UCCS, including through the development of policy and custom.

19. Professors at UCCS are subject to the authority, supervision, management and direction of their department chairs, the deans of their college, the provost, the chancellor, the Office of Institutional Equity, and the Regents.

20. Upon information and belief, the department chairs, deans, provost, and chancellor, under the ultimate authority of the Regents, have authority concerning appointment of educators, including professors and associate professors, at UCCS.

21. Upon information and belief, the department chairs, deans, provost, and chancellor have authority concerning recommendation, investigation and granting of tenure to professors and associate professors at USSC in conjunction with the Regents.

22. Upon information and belief, the department chairs, deans, provost, and chancellor have authority to oversee and institute disciplinary action, administrative action, and/or otherwise control and prevent misconduct by professors at UCCS. This includes proceedings to remove professors from the classroom, prohibit contact with students, and/or institute proceedings for removal from employment.

23. As to supervisory hierarchy, department chairs are directly above professors, deans above department chairs, the provost above deans, and the chancellor above the provost.

24. The Director of the Office of Institutional Equity at UCCS is responsible for ensuring compliance with state and federal laws and internal policies addressing sex and gender-based harassment and is responsible for coordinating with other departments, units and colleges within the UCCS system to take appropriate steps to protect UCCS students and staff from discriminatory conduct, including any steps necessary to stop the conduct and prevent recurrence and to ensure students and staff are operating in a safe environment.

25. The events discussed herein all occurred between 2020 and 2022.

26. All events discussed herein as to UCCS occurred on or in relation to the UCCS campus and UCCS education-related activities.

27. UCCS claims it provides its students with "life-enriching experiences in a vibrant university community" through "guiding principles" that include "integrity."

28. UCCS advertises that it "provide[s] an open, safe, and supportive campus environment based on mutual respect, engagement, and learning for everyone." It maintains purported "guiding principles" to include promoting diversity, ensuring the university is a "social catalyst", and providing "an outstanding, respectful, and responsive living, learning, teaching, and working environment."

29. UCCS advertises that it "value[s] integrity and expect[s] ethical behavior from each member of the campus community in all interactions," and that UCCS "build[s] an environment where we treat each other with respect."

30. UCCS and the other Defendants did not provide live-enriching experiences, did not act with integrity, did not provide a safe and supportive environment based on mutual respect, and did not value integrity and ethical behavior or treat Plaintiff with respect. Instead, UCCS and the other Defendants fostered an environment within the Department of Mathematics full of discrimination, harassment, violence, sexual assault and abuse.

31. In the fall of 2020, Mark Tomforde was hired by USSC and appointed as an associate professor of mathematics within the Department of Mathematics and granted tenure by Defendants.

**Mark Tomforde's History of Abusive and Assaultive Conduct Towards Females**

32. Prior to being appointed as a tenured associate professor of mathematics at UCCS, Tomforde was a professor of various levels at the University of Houston from approximately 2006 until 2020.

33. At the University of Houston, Tomforde engaged in significant inappropriate harassing, abusive and assaultive behavior with several female students in a pattern that he later brought to UCCS and subjected Plaintiff to.

34. Multiple female students at the University of Houston reported that Tomforde used abusive and coercive tactics to isolate them from their peer group and other students and faculty.

35. Female students at the University of Houston reported that Tomforde targeted students while they were still pursuing their undergraduate degrees and then groomed them to succumb to his abusive and coercive conduct as graduate students working under his supervision.

36. Female students at the University of Houston reported that Tomforde worked to isolate them, including through gossiping about other faculty and students in a derogatory way - often similar to middle school antics – and denigrating those others persons to the female student. These efforts were part and parcel with his conduct seeking to paint himself as the sole person able to assist the female student within the department and make the female student dependent on him for academic access and advancement.

37. Female students at the University of Houston reported that Tomforde demanded information from female students that was inappropriate for sharing with educators and advisors in his role, including personal medical and mental health information

38. Female students at the University of Houston reported that Tomforde displayed abusive anger towards them which would create fear for their personal safety.

39. Female students at the University of Houston reported that Tomforde exhibited unusual anger towards female students for personal matters unrelated to their academic work or his role in their education.

40. Female students at the University of Houston reported that Tomforde pushed for meetings off campus, in particular at coffee shops, where he would cross boundaries with female students.

41. Female students at the University of Houston reported that Tomforde made inappropriate comments concerning female students' bodies, appearance, and body art.

42. Female students at the University of Houston reported that Tomforde engaged in inappropriate consumption of substances such as alcohol with female students in apparent efforts to incapacitate them and use such incidents as a means to flirt with female students.

43. Female students at the University of Houston reported that Tomforde engaged in sexually harassing conduct and made inappropriate sexual comments towards female students, including references to a possible gang-rape of at least one female student while she may be incapacitated.

44. One female student at the University of Houston described Tomforde's treatment of female students as being riddled with "guilt, pressure, a feeling of owing him your life, making you feel like you're not good enough to work with anyone in the department besides him, feeling intimidated, feeling uncomfortable."

45. As a result of the several reports of blatant misconduct of Tomforde, the University of Houston Department of Mathematics instituted extreme restrictions on Tomforde's role, responsibilities and authority therein.

46. In or around the 2018/2019 academic year, Tomforde was ordered to cease all involvement in any student organization for a period of three years.

47. Tomforde was also ordered to step down from his position on an undergraduate studies committee and was not allowed to hold any committee position that involved student affairs for a period of three years.

48. Tomforde was ordered to cease all communications with students on their personal or home phones and to limit his communications with them to email through the university system on topics related to academic matters.

49. Tomforde was ordered to engage in training on sensitivity, discrimination and harassment.

50. Further, in a telling admission that Tomforde represented a potential danger to female students if not properly supervised, Tomforde was ordered by the University of Houston

Mathematics Department to only meet with students in his office on campus and then only with the door open so the interior of the office was viewable to others.

**The UCCS Mathematics Department Provided Tomforde Protection to Continue His Abusive and Assaultive Conduct Due to its Discriminatory Environment**

51. Unfortunately for Plaintiff, the discipline and chastisement by the University of Houston did not deter Tomforde from further engaging in inappropriate and illegal conduct with female students. To the contrary, Tomforde simply began looking to move to another university where his misconduct would not be subject to scrutiny, and he might obtain further protection from discipline.

52. Upon information and belief, Tomforde began to have discussions with UCCS mathematics professor and friend, Defendant Gene Abrams, concerning the possibility of transferring to UCCS from the University of Houston so that Tomforde could receive the "support" he desired.

53. The "support" Tomforde needed was for an institution to protect him, silence female students that reported gender-motivated misconduct, and permit him to continue to prey upon female students.

54. The Mathematics Department at UCCS provided just such "support" for Tomforde.

55. Upon information and belief, the Mathematics Department at UCCS has a history, pattern, practice and custom of gender based discrimination against females students and instructors.

56. The Mathematics Department at UCCS lists twelve persons as professors of one level or another and, upon information and belief, an individual is only granted such status with the granting of tenure except in rare circumstances.

57. Not a single tenured professor at the Mathematics Department at UCCS is female.

58. The lack of tenured female professors within the Mathematics Department at UCCS is unusual and suggests a culture and environment shaped by policies, practices, and customs that is unsafe for females.

59. According to the analysis of the Mathematical and Statistical Sciences Annual Survey for 2019 issued by the American Mathematical Society, the Mathematics Department of UCCS is far below other institutions in representation for women. For instance, in 2018/2019 American academic institutions were increasing generally increasing the percentage of women in tenure and tenure-track positions. During that time frame, women hired into such positions were significantly up across the board and accounted for nearly 2 out of 5 of every tenure-track hire and women accounted for approximately 1 out of 3 full-time faculty, including 1 out of 4 of all Doctoral Math department full-time faculty positions.

60. UCCS has zero women in these positions.

61. Based on the numbers of women being hired and holding such positions within mathematics departments throughout the country, it is reasonable and likely that the lack of females being hired and holding such positions at UCCS is the result of a policy, practice and custom of discrimination against females.

62. Upon information and belief, the Mathematics Department at UCCS has only had a single female tenured professor in recent years, and that single tenured professor left UCCS as a result of harassment and misconduct directed at her.

63. Upon information and belief, at the same time the sole tenured female within the Mathematics Department at UCCS was exiting on account of harassment and misconduct, Defendant Abrams and Tomforde began discussing Tomforde's exit from the University of

Houston, where his access and ability to continue grooming, manipulating, abusing and assaulting female students was severely limited.

**Mark Tomforde is Hired and Appointed to UCCS Mathematics Department Despite Blinding Red Flags and a History of Discrimination, Harassment and Abuse and Assault of Female Students**

64. Tomforde and Abrams discussed Tomforde's tenure at Houston and the reasons for his exit, including the lack of "support" mentioned above.

65. Upon information and belief, the remaining Defendants, including in particular Defendants Abrams and Mesyan, recruited Tomforde to UCCS despite the extremely troubling history of misconduct, discrimination, harassment, abuse and assault of female students at the University of Houston.

66. Upon information and belief, Tomforde was appointed as a tenured associate professor for the Fall of 2020 without any prior academic experience within the University of Colorado system.

67. According to university policy, in order to obtain tenure as a new lateral hire from another institution, a special exception must be made in the tenure process at several levels, including the department chair, provost, chancellor, president, and Board of Regents.

68. Typically, to obtain tenure at UCCS, one must complete a probationary period to include a three-year tenure-track appointment as an assistant professor, followed by two consecutive two-year re-appointments.

69. Academics arriving at UCCS with prior academic experience, such as Tomforde, may be granted credit towards this probationary period for prior experience up to a maximum of three years, meaning four years of service as an assistant professor would still be required before obtaining tenure and the rank of associate professor.

70. In special situations, only with full documentation, are faculty members to be hired on a modified tenure review schedule. Upon information and belief, Tomforde was hired on a modified tenure review schedule.

71. To receive the appointment, Tomforde was required to "demonstrate[] meritorious performance" in numerous areas, including "teaching." In order to obtain tenure, Tomforde was required to submit a dossier and undergo a comprehensive review by multiple levels, including the department chair, dean of the college, provost, and chancellor.

72. Evaluators in the process evaluated Tomforde by examining the criteria and standards of UCCS and the evidence presented.

73. As Tomforde was not applying for appointment from within the University of Colorado system, but rather from the University of Houston, where he had been reprimanded and subjected to significant and troubling restrictions on his interactions and conduct towards students, it was necessary for evaluators at each level to examine Tomforde's history at University of Houston.

74. A review of Tomforde's history at the University of Houston would include information concerning the plethora of complaints and reports of highly inappropriate, discriminatory, abusive and assaultive misconduct and the serious steps the University of Houston administration believed were necessary to protect female students in their interactions with Tomforde.

75. In other words, evaluators, in particular at the lower levels, must have been aware of Tomforde's problems at the University of Houston.

76. Tomforde's prior conduct presented a known and significant risk to female students and staff but the evaluators, upon information and belief to include Defendants Abrams, Mesyan,

Welshon, Vidler, Christensen, and Reddy, deliberately ignored and or acted indifferent to the same and collaborated to place Tomforde in a position of authority and access to the same class of females that he was known to represent a serious and significant risk to.

77. The Defendants concealed the known substantial risk of significant harm presented by Tomforde from Plaintiff and other students.

78. Unsurprisingly, almost immediately upon his appointment, Tomforde returned to his prior abusive and assaultive playbook described by University of Houston female students as outlined above and targeted Plaintiff, then an undergraduate student in the Mathematics Department of UCCS.

**Under Supervision of Other Defendants, Tomforde Selects, Grooms, Abuses and Assaults Plaintiff**

79. Plaintiff was an undergraduate student completing a B.S. in mathematics with a minor in computer science in the fall of 2020 when Tomforde was hired despite his extremely troubling past abusive, harassing, discriminatory and assaultive behavior towards female students.

80. At the time, Plaintiff fully intended to pursue her master of science degree in Mathematics at UCCS and then continue in academia to obtain a doctorate and professorship.

81. Plaintiff had previously been informed by another faculty member that Tomforde was joining the UCCS Mathematics Department and suggested Plaintiff consider working with Tomforde as a graduate student.

82. Plaintiff began communicating with Tomforde in or around the summer of 2020 and Tomforde used those communications as he had with female students at the University of Houston, to begin isolating Plaintiff and grooming her for his eventual abuse and assault.

83. Tomforde's conduct as to Plaintiff all occurred in the context of the advisor/graduate student and/or mentor/mentee relationship and was part and parcel of his role and responsibilities as associate professor in the Mathematics Department of UCCS.

84. Tomforde began working to isolate Plaintiff from other members of the faculty through gossip and denigration of the same.

85. As was the pattern at the University of Houston, Tomforde began to push boundaries with Plaintiff, pushing to discuss personal matters, contacting her often, and extending meetings beyond what was appropriate or necessary in the context of a mentor/mentee or advisor relationship.

86. Tomforde began to push beyond boundaries in his usual grooming modus operandi with Plaintiff and began to flirt with Plaintiff in their communications and to gradually seek more and more control over her academic and personal life, using the extreme power disparity that he cultured to ensure her compliance and subservience to him.

87. Tomforde began to push Plaintiff for verification that she would work with him and was interested in working with him as a strange sort of validation request.

88. Tomforde began injecting himself into Plaintiff's personal affairs, including exercising control over her body by demanding she consult him prior to obtaining any body art (tattoo).

89. Upon meeting in person, Tomforde almost immediately proposed a sexual relationship as a component of a working relationship with Plaintiff and expressed romantic love for Plaintiff.

90. Tomforde coerced Plaintiff to provide access to her calendaring system and used the calendaring system to schedule a time for sex each week.

91. Tomforde pressed Plaintiff to disclose personal information as he had at the University of Houston, including information concerning Plaintiff's trauma history, mental health history and physical health history.

92. Tomforde would use this personal information as a weapon of retaliation against Plaintiff later.

93. As Tomforde arrived in Colorado Springs he began to accelerate his grooming activities.

94. Tomforde regularly sought to meet with Plaintiff off campus at local coffee shops, just as he had done with students at the University of Houston.

95. Plaintiff was a young, impressionable student seeking to embark on a career in academia and was particularly vulnerable to persons in positions of authority and influence abusing their power over her during this timeframe. Defendants, being career post-secondary educators, were aware of this as it is typical in the university environment.

96. Tomforde continually repeatedly expressed romantic thoughts and sexual feelings for Plaintiff.

97. Plaintiff repeatedly informed Tomforde she did not desire to enter into a relationship with Tomforde and informed him that he was making her uncomfortable.

98. Tomforde continued to pressure Plaintiff to engage in a relationship with him.

99. Tomforde pressured Plaintiff to remove other males from her life, in particular any male with whom she had a romantic relationship.

100. Tomforde acted like a jealous high schooler as to Plaintiff's sexual relations and accused her of engaging in relations with other persons as a way to express feelings towards him or proof that Plaintiff desired Tomforde.

101. Instances of sexual harassment and assault by Tomforde towards Plaintiff became common.

102. Tomforde would always insist on meeting with Plaintiff behind closed doors, either in a conference room of sorts at a coffee shop or in his office on campus.

103. Tomforde forced Plaintiff to sit on his lap and kissed Plaintiff against her desires on multiple occasions.

104. Tomforde would grab Plaintiff and pull her close to his imposing physical presence and force her to hold his face and look at him. In that position, Tomforde would force Plaintiff to repeat statements of affection for him.

105. Tomforde would also force Plaintiff to repeat sexually explicit phrases to him, including forcing her to tell him that she wished for his "cock" to "explode" inside of her.

106. Tomforde groped and felt Plaintiff's body and private parts without her consent repeatedly, often at the local coffee shop in a closed conference room and at his office on campus behind closed doors.

107. For instance, on one occasion Tomforde had Plaintiff in his office and Tomforde shut the door over Plaintiff's protestation.

108. Tomforde then proceeded to grab Plaintiff by the waist in a provocative manner suggestive of his desire for sexual contact with Plaintiff.

109. Plaintiff repeated to Tomforde, as she had often, that she did not want Tomforde to touch her in that manner and that she did not want this.

110. Tomforde reacted with anger and jealousy and verbally abused Plaintiff about her body and clothing.

111. On another occasion, Tomforde had Plaintiff in his office on campus with the door closed (something that he was prohibited from doing at the University of Houston).

112. Plaintiff lay down on the floor to relieve back pain she was known to have.

113. Plaintiff is very petite in stature and Tomforde is a taller, heavy-set man. There is an extreme physical disparity between the two.

114. Tomforde lay himself on top of Plaintiff.

115. Plaintiff urged Tomforde to stop but Tomforde shoved his hands into Plaintiff's pants and undergarments and groped and molested her genitals without her consent.

116. Tomforde's actions towards Plaintiff mirrored the reports from the University of Houston which would have been reviewed in the hiring and tenure appointment processes by the other Defendants.

117. Each of these incidents occurred in the course and conduct of Tomforde's role as Plaintiff's academic advisor through her program of study.

118. When Plaintiff suggested that Tomforde made her uncomfortable or that his behavior was inappropriate, Tomforde expressed to Plaintiff that her continued subservience and agreement was required for him to continue as her advisor.

119. It would be a significant academic set-back for Plaintiff to lose her advisor and Tomforde knew this.

120. In other words, Tomforde made it clear that Plaintiff's acquiescence in his advances, abuse and assault was required for her academic experience – quid pro quo.

121. In summary, Tomforde presented classic abusive partner characteristics towards Plaintiff, including manipulation, denigration, isolation, mental, physical and sexual abuse.

122. Upon information and belief, Tomforde's unusual and excessive interest in Plaintiff and conduct towards her was noticed by other students and members of the faculty.

123. Tomforde remained under the supervision and control of the remaining Defendants during the times in which he was abusing and assaulting Plaintiff.

**The Mathematics Department Conspires to Retaliate Against and Silence Plaintiff**

124. Tomforde's abuse drove Plaintiff close to the breaking point by December 2021.

125. At that time, Plaintiff reported Tomforde's actions to another member of the UCCS faculty, Sean Dean.

126. While Plaintiff was meeting with Sean Dean, Tomforde called her phone and asked to meet with Plaintiff.

127. Plaintiff met with Tomforde and informed him that she had reported his activity to Sean Dean.

128. Tomforde reacted with concern and noted his belief that he would have to move again in reference to having to leave the University of Houston because female students there also reported his grossly inappropriate behavior and his access and ability to groom, abuse and assault females was curtailed by UH.

129. Tomforde pressured and coerced Plaintiff to return to Sean Dean and express that her report was inaccurate. At this time, Tomforde remained the advisor for Plaintiff and the key to her academic experience at UCCS and future academic advancement, and Plaintiff was aware of Tomforde's repeated threats to cease advising or assisting her if she did not go along with his desires.

130. Around the same time, Plaintiff made a preliminary report to the Office of Institutional Equity, of which Defendant Laura Emmot is director.

131. Dean also reported to OIE, and thereby Defendant Emmot, that Plaintiff had reported troubling sexual misconduct.

132. OIE, under the supervision of and by and through Defendant Emmot, failed to perform any adequate follow-up to the multiple reports, including, upon information and belief, failing to follow-up with Dean after he placed a telephonic and written vague report.

133. Plaintiff requested a meeting with OIE, but OIE failed to schedule such a meeting and sent an inquiry to Plaintiff while students were on break between semesters.

134. OIE, by and through Defendant Emmot, then closed the file.

135. In this context, Defendants Tomforde, Mesyan and Abrams took the opportunity to conspire together to retaliate against Plaintiff and violate her civil rights to equal protection and those outlined within Title IX.

136. Tomforde discussed the situation concerning he and Plaintiff with Defendants Mesyan and Abrams.

137. Collectively, the trio determined not to make any report to OIE despite obligation to do so pursuant to written policy and directive of the University of Colorado.

138. This is evidence of the actual custom, policy and practice of the Mathematics Department at UCCS, which is to punish females, in particular those that reject sexual advancements of male professors within that department.

139. In addition to the overt act of refusing to report the matter as required, additional overt acts in furtherance of the retaliatory conspiracy followed.

140. Tomforde engaged in a full character assassination of Plaintiff, disclosing to her colleagues and other professors highly personal details he had coerced her to disclose as part of

his advising her and adding false details about her mental health status and claims of active drug use and abuse.

141. Tomforde, Mesyan and Abrams conspired to further remove Plaintiff from her academic and teaching responsibilities for the remainder of the semester and placed other students, primarily male, in those positions.

142. Plaintiff became largely blacklisted within the Mathematics Department at UCCS and isolated from her peers and other instructors.

143. Prior thereto, Plaintiff was a celebrated student within the Mathematics Department as an undergraduate and graduate student that showed promise for a future in academia.

144. Members of the UCCS faculty described Plaintiff as "a great student" that was "on top of things when it comes to work" and did well with her own students.

145. Tomforde, Mesyan and Abrams nevertheless expressed and perpetuated falsehoods that Plaintiff was abusing drugs and creating false stories about Tomforde (stories that matched very closely the experiences of female students at the University of Houston).

146. In or around late April 2022, Tomforde assaulted Plaintiff again at the coffee shop Pike's Perk and accused her of being sexual and provocative towards him.

147. When Plaintiff protested that Tomforde's accusations were untrue, Tomforde became irate, yelling at Plaintiff in a classic harassing and abusive maneuver of blaming the female for the male's sexually inappropriate desires and conduct.

148. Plaintiff informed Tomforde, again, that she was uncomfortable and did not feel save. She attempted to gather her things to leave as she was in fear for her safety and the pair were in a closed room at the coffee shop with few, if any, other people nearby.

149. Tomforde screamed at Plaintiff again that his continued assistance in her academic advancement was conditioned on accepting his misconduct behavior.

150. When Plaintiff tried nonetheless to exit, Tomforde physically blocked her path and yelled at her to sit down.

151. Tomforde then physically yanked her back into the room, forced her into a chair, and held her hostage.

152. Tomforde had made Plaintiff sufficiently terrified of his actions and concerned as to the extent to which Tomforde would go, in particular after the repeated ongoing unwanted sexual assaults.

153. Tomforde then forced and coerced Plaintiff to agree with him.

154. Tomforde, Mesyan and Abrams continued their efforts thereafter, and Tomforde especially provided false narratives to Plaintiff's colleagues and professors in the department.

155. The efforts of Tomforde, Mesyan and Abrams infected Plaintiff's colleagues and other educators and led to professors refusing to work with her, including Abrams who expressed he would not "touch her with a ten foot pole" and refused to be her advisor.

156. This meant that Plaintiff would be stuck with Tomforde as her advisor.

157. Plaintiff's injuries and damages were such that she was prevented from recognizing the conduct of Tomforde and the other Defendants as a source of injury to her.

158. Plaintiff was manipulated and placed under such duress to the point that she was unable to comprehend and enforce her legal rights in relation to Tomforde's egregious misconduct.

159. When Plaintiff finally was able to comprehend and enforce her rights and initiated formal Title IX proceedings in regard to the conduct of Tomforde.

160. As the following semester neared and Plaintiff was going to be forced to return to constant contact with Tomforde as an advisor and professor, Plaintiff again notified OIE of an issue and requested assistance in obtaining an order of no contact.

161. Defendants Abrams and Mesyan have expressed concern that the investigation by OIE and UCCS into Tomforde, which has verified similar conduct that led to serious and significant disciplinary action by the University of Houston, is problematic for Tomforde.

162. Defendant Mesyan has expressed concern that Tomforde has been unable to engage in activities for UCCS following the full report from Plaintiff, expressing an apparent disagreement with the efforts UH undertook to protect students from Tomforde and further highlighting the invidious discriminatory custom, policies and practices of the Mathematics Department under the leadership of Defendant Mesyan.

163. The acts and omissions of said Defendants and those with supervisory authority over them, including the remaining Defendants, is evidence of a practice, policy and custom that creates a culture of silence and condones, ratifies, encourages and supports invidious discriminatory and abusive conduct towards females, in particular within the Mathematics Department.

164. The acts and omissions of said Defendants and those with supervisory authority over them, including the remaining Defendants, evidences a practice, policy and/or custom put in place by the Defendants which inequitably benefits and protects males, particularly male educators, over females within the UCCS community in violation of the United States Constitution and amounts to invidious discrimination.

165. The acts and omissions of said Defendants and those with supervisory authority over them, including the remaining Defendants, in response to Plaintiff's initial attempts to obtain

assistant were themselves hostile invidious discriminatory action in violation of the United States Constitution by the Defendants, in particular Mesyan, the department chair, Abrams and Tomforde.

166. Actions designed to silence the voice of Plaintiff in this manner are themselves acts of invidious discriminatory violence and revictimization in violation of the United States Constitution by Defendants, in particular Mesyan, the department chair, Abrams and Tomforde.

167. The conduct of Defendants was motivated by evil motive or intent.

168. The conduct of Defendants involved reckless or callous indifference to federally-protected civil rights of Plaintiff and others females.

169. Given Tomforde's role, position and authority at UCCS, it was foreseeable his conduct would result in harm to female students as it had at the University of Houston.

170. It was foreseeable to Defendants that the actions and omissions of Defendants as to Tomforde would result in continued and further danger and harm to Plaintiff and other female students associated with the mathematics department at UCCS.

171. The conduct of Defendants was willful, intentional, wanton, or taken in utter disregard for the safety and well-being of others, especially female students including Plaintiff.

**Plaintiff's Academic Opportunity and Career Destroyed by Invidious Discrimination**

172. Ultimately, Defendants Tomforde, Mesyan, and Abrams created such an intensively hostile environment for female students and Plaintiff in particular that Plaintiff ceased her academic career.

173. As a direct result of Defendants' actions, Plaintiff is no longer pursuing a doctorate in mathematics at UCCS or any university, despite exhibiting a high aptitude in the field and ability to obtain such a degree and, ultimately, likely a professorship.

## CLAIMS

<u>Count I</u>
(Defendant Tomforde - 42 U.S.C. § 1983)

174. The preceding paragraphs are incorporated as if fully stated herein.

175. Plaintiff was a member of a particular closed and limited group, that being female students.

176. Male students at UCCS were similarly situated to Plaintiff.

177. Plaintiff has rights to the equal protection of law and bodily integrity protected by the Constitution of the United States and the Fourteenth Amendment thereto.

178. Defendant Tomforde deprived Plaintiff of said rights.

179. Defendant Tomforde deprived Plaintiff of her right to the equal protection of the law when he sexually harassed, demeaned, intimidated, physically and sexually assaulted, and otherwise abused Plaintiff because of her gender and for his own gratification and sexual purposes.

180. Defendant Tomforde had a history of doing the same with other female students and UCCS and the other Defendants were on notice of said conduct.

181. Defendant Tomforde did not do so with male students and staff at NMSU.

182. Defendants Tomforde violated Plaintiff's due process rights to bodily integrity.

183. Defendant Tomforde's abuse of Plaintiff was egregious and outrageous and shocks the conscience in its depravity, dangerousness, and brutality.

184. Defendant Tomforde was a state actor in his position with UCCS and acted in violation of Plaintiff's civil rights as a state actor.

185. Defendant Tomforde was carrying out the functions and duties of his position with UCCS in his interactions with Plaintiff, including as an educator, mentor, and purveyor of educational and professional development opportunities for students of UCCS.

186. Defendant Tomforde's conduct was egregious and created unreasonable risk to Plaintiff and other members of the class of female students at UCCS.

187. Defendant Tomforde's conduct shocks the conscience and was intentional, reckless, willful, and exhibited callous indifference to the rights of Plaintiff.

188. Defendant Tomforde's conduct was a proximate cause of Plaintiff's injuries.

Count II
(Defendants UCCS, Regents, Mesyan, Welshon, Vidler, Christensen, Klebe, Reddy, Emmot, Kennedy and the Doe Defendants - 42 U.S.C. § 1983)

189. The preceding paragraphs are incorporated as if fully set forth herein.

190. Defendants UCCS, Regents, Mesyan, Welshon, Vidler, Christensen, Klebe, Reddy, Emmot, Kenndy and the Doe Defendants had a duty to ensure the practices, policies, or customs of UCCS comport with the standards required by the United States Constitution.

191. Said Defendants had a duty of due care as it relates to supervising its educators, staff and faculty, including a duty to adequately screen, hire, train, supervise, discipline and maintain educators, faculty and staff.

192. Said Defendants failed to exercise due care in the screening, hiring, training, supervision, discipline and maintenance of Defendant Tomforde.

193. Said Defendants failed to provide adequate training, supervision and discipline to Defendant Tomforde when they permitted Tomforde to maintain access, authority and influence over female students even after available notice of prior improper behavior, including sexual aggression, controlling and abusive behavior, and harassment and discrimination towards female students.

194. Said Defendants failed to provide adequate training, supervision and discipline to Defendant Tomforde in response to reports of concerning conduct involving female students, including Plaintiff.

195. Said Defendants were on notice that Tomforde was a danger to female students and he posed a substantial risk of significant harm in abuse, discrimination, harassment and unwanted sexual advances towards females through his positions and authority as an agent and representative of UCCS, but, acting with deliberate indifference, failed to take reasonable measures to prevent his discriminatory practices, protect the bodily integrity and safety of female students, or otherwise ensure Tomforde's actions were in compliance with state and federal law and the Constitution.

196. Said Defendants had a duty to protect the bodily integrity and safety of female students and to take reasonable actions to ensure Tomforde and other professors were not engaging in sexually inappropriate and/or abusive conduct towards vulnerable students.

197. Said Defendants, acting with deliberate indifference, did not take reasonable actions to protect the bodily integrity and safety of female students or to ensure Tomforde was not engaging in sexually inappropriate and/or abusive conduct towards vulnerable students although the University of Houston had made efforts.

198. Said Defendants were aware of a substantial risk of danger to female students by Tomforde and his activities.

199. Said Defendants were deliberately indifferent to the foreseeable substantial risk to female students presented by Tomforde and failed to take reasonable corrective action or other reasonable steps to mitigate that risk.

200. Said Defendants had a pattern, practice and custom of failing to adequately supervise and discipline faculty and staff in regard to inappropriate conduct towards female students and staff.

201. Said Defendants, acting with deliberate indifference, either instituted or permitted a practice, policy, or custom in which female students and staff at UCCS were not adequately protected from unwanted sexual advances and physical, sexual and psychological abuse by faculty, in particular within the mathematics department.

202. Said Defendants, acting with deliberate indifference, either instituted or permitted a practice, policy or custom condoning or ratifying assault, sexual harassment and sexual violence by faculty and educators against female students and staff.

203. Said Defendants, acting with deliberate indifference, either instituted or permitted a practice, policy or custom of inadequate, unreasonable and/or meaningless response, supervision and discipline of faculty and staff that abused, assaulted and/or harassed female students and staff.

204. Said Defendants, acting with deliberate indifference, either instituted or permitted a practice, policy or custom that promoted the hostile and abusive sexualized environment Plaintiff endured from Tomforde.

205. Said Defendants, acting with deliberate indifference, either instituted or permitted a practice, policy or custom condoning or ratifying assault, sexual harassment and sexual violence by faculty and educators against female students and staff.

206. Said Defendants failed to enforce practices, policies or customs to curtail hostile and abusive sexualized environments towards female students and staff and to instruct and address faculty and staff engaged in abusive behavior.

207. Said Defendants, acting with deliberate indifference, violated Plaintiff's civil rights, including the right to equal protection under the law and to be free from unlawful discriminatory practices by state actors.

208. The actions and omissions of Defendants exhibited deliberate indifference and proximately caused Plaintiff's injuries.

209. The policies, practices or customs of Defendants proximately caused Plaintiff's injuries.

210. The actions and omissions of Defendants proximately caused Plaintiff's injuries.

Count III
(All Defendants – Title IX)

211. The preceding paragraphs are incorporated as if fully stated herein.

212. Plaintiff was a student of UCCS.

213. Plaintiff endured harassment, assault, and abuse so severe, offensive, and pervasive so as to deprive Plaintiff of access to educational and professional development opportunities and/or benefits provided by and through UCCS.

214. Defendants knew Tomforde was engaged in harassment, sexual assault and abuse of female students and had constructive knowledge of the specific harassment, sexual assault and abuse of Plaintiff.

215. Defendants had the authority, ability, and wherewithal to rectify and/or remedy the hostile, harassing, assaultive and abusive environment faced by female students but was deliberately indifferent to the actions of Tomforde and the likelihood of injury to Plaintiff and other female students, and failed to so rectify and/or remedy the hostile environment.

216. Defendants had a duty pursuant to 20 U.S.C. § 1681 (Title IX) to provide an educational environment free from any exclusion, denial of benefits, or discrimination on the basis of sex.

217. The duties of Defendants included a responsibility and duty to ensure equitable treatment of Plaintiff.

218. Plaintiff was subjected to discrimination on the account of her sex in violation of Title IX by the actions and omissions of Defendants.

219. Defendants established policies and customs permitting and/or condoning discriminatory, harassing, and physically, emotionally and sexually abusive environment towards female students by faculty during sanctioned activities, including, but not limited to, policies and customs of failing to report and address misconduct of male faculty directed towards female students, failing to provide for even token representation of females on the faculty of the mathematics department, appointing and hiring males with known histories of discrimination, harassment and abuse towards female students, and failing to adequately and reasonably discipline misconduct by male faculty directed towards female students and staff.

220. The above resulted in Plaintiff being subjected to extreme abuse in connection with USSC activities and on USSC grounds.

221. The above lead to Plaintiff having to forego the assistance and connection of USSC in advancement of her educational and professional opportunities that Defendants were to provide.

222. Defendants did not adequately provide training to faculty and staff on responding to potential inappropriate behavior, to include sexually inappropriate conduct with students and staff.

223. Defendants exhibited recklessness and deliberate indifference to abuse of females by male faculty, in particular within the Mathematics Department and harassment and sexual violence directed towards female students and staff, including Plaintiff.

224. Plaintiff was deprived of benefits, including educational and professional advancement opportunities by the conduct of Defendants, and she was subjected to discrimination on the basis of her sex in an educational program or activity receiving financial assistance from the federal government in violation of Title IX by Defendants' actions and omissions extending through the conclusion of her graduate student career in December 2022.

225. The discriminatory violation of Title IX proximately caused Plaintiff injuries, including significant loss of future opportunity and earnings.

226. Defendants conduct was egregious and created unreasonable risk to Plaintiff and other members of the class of female students at USSC.

227. Defendants conduct shocks the conscience and was intentional, reckless, willful and exhibited callous indifference to the rights of Plaintiff.

Count IV

(Defendants Tomforde, Abrams and Mesyan – 42 U.S.C. § 1985)

228. The preceding paragraphs are incorporated as if fully stated herein.

229. Plaintiff is a member of a class of persons entitled to the equal protection of laws, that being females.

230. Defendants Tomforde, Abrams and Mesyan conspired and agreed to commits acts that would violate the right of equal protection of laws for females, including Plaintiff, and to prevent or hinder the authorities of the State of Colorado from giving or securing to all persons within the State of Colorado the equal protection of the laws.

231. Through their actions discussed above, said Defendants undertook covert acts to further that agreement.

232. Invidiously discriminatory animus was behind the actions of said Defendants towards females, including Plaintiff.

233. The invidious discriminatory animus is inferred by, among other factors, the lack of status of females in anywhere near proportion to other secondary institutions, the history of discrimination and harassment, the placement of Defendant Tomforde despite his actions at the University of Houston, and efforts to silence, discredit and retaliate against females that do not accept the invidious discriminatory animus and environment created thereby.

234. The conspiracy described herein had a purpose to hinder or prevent authorities from giving normal protections and opportunities to women at state universities as required by state and federal law and the constitution of the United States.

235. Plaintiff was injured in both her person and property and deprived of a right or privilege of a citizen of the United States by the conspiracy of said Defendants, that being the right to bodily integrity and the equal protection of laws.

236. Said Defendants' conspiracy was a proximate cause of Plaintiff's injuries.

<u>Damages</u>

237. The preceding paragraphs are incorporated as if fully stated herein.

238. As a proximate result of the conduct of Defendants:

a. Plaintiff endured physical pain and injury;

b. Plaintiff suffered and continues to suffer from emotional distress;

c. Plaintiff's constitutional rights were violated;

d. As a result of the above injuries, Plaintiff is entitled to recover an aware of full compensatory damages in amounts to be determined by the jury at trial.

239. The conduct of Defendants involved intentional misconduct, recklessness, gross negligence or callous indifference to Plaintiff's rights, or was motivated by malice, evil motive, or intent, and thus Plaintiff is entitled to recover awards for punitive and exemplary damages separately against defendants in amounts to be determined at trial.

WHEREFORE, Plaintiff demands the following relief against Defendants:

A. Award of compensatory damages against all Defendants, jointly and severally, for Plaintiff;

B. Award of punitive damages against the Defendants jointly and severally;

C. Award prejudgment and post-judgment interest on any amounts recovered for Plaintiff;

D. Injunctive relief to ensure adequate protection of female's rights and opportunities within the university system, including, but not limited to:

i. Removal of tenure and appointment of those responsible for violation of Plaintiff's rights, including but not limited to Mark Tomforde, Gene Abrams and Zachary Mesyan;

ii. Institution of policies and procedures that ensure meaningful follow-up with any student making a report concerning potential sexual violence;

iii. Installation of recording equipment in all facilities where faculty meets with students;

iv. Enhanced, regular required training and review procedures to address discrimination;

v. Institution of policies and procedures to ensure appropriate representation of women on faculty at UCCS, especially within the Math Department; and

vi. Other injunctive relief as may be appropriate.

E. Trial by jury on all issues so triable; and

F. Such other and further relief as the Court may deem appropriate under the circumstances.

Respectfully submitted,

PAUL LINNENBURGER
Lane + Linnenburger + Lane LLP
2266 Dayton St., Ste. A2
Aurora, Colorado 80010
Ph: 720.400.81500
Email: paul@attorneyslane.com